

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 15, 2014

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KLAAS TALSMA d/b/a KLAAS TALSMA | § | |
| DAIRY d/b/a FRISIA FARMS; | § | |
| FRISIA FARMS, INC.; FRISIA | § | CASE NO. 10-43790-DML-11 |
| HARTLEY, LLC; AND FRISIA WEST, LLC | § | |
| | § | |
| DEBTORS. | § | |
| | § | |
| | § | |
| FRISIA HARTLEY, LLC; KLAAS | § | |
| TALSMA; FRISIA FARMS, INC.; | § | |
| AND FRISIA WEST, LLC | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | ADVERSARY NO. 14-04004 |
| v. | § | |
| | § | |
| WELLS FARGO BANK, N.A. | § | |
| | § | |
| DEFENDANT. | § | |
| | § | |

## MEMORANDUM OPINION

Before the court are the *Brief in Support of Court's Jurisdiction over Controversy* (Case docket no. 748,[1] "Talsma Brief"), by which Klaas Talsma ("Talsma" or "Plaintiff") argues this court has jurisdiction over various claims asserted by Talsma, Frisia Farms, Inc., and Frisia West, LLC (collectively, "Debtors")[2] in *[Debtors'] Verified Original Complaint* (Adv. docket no. 1, the "Complaint") against Debtors' secured lender Wells Fargo Bank, N.A. ("Wells Fargo"), and *Wells Fargo's Reply Brief Regarding Bankruptcy Court Jurisdiction* (Case docket no. 751, "Wells Fargo Brief"), by which Wells Fargo argues jurisdiction is improper (together, the "Parties' Briefs").

The court has treated this proceeding as a motion to dismiss for want of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and Federal Rule of Bankruptcy Procedure 7012(b).  Accordingly, Debtors bear the burden to show this court has statutory and constitutional authority to hear the Adversary.  *See Boudreau v. United States*, 53 F.3d 81, 82 (5th Cir. 1995).  In determining whether jurisdiction and authority are proper, the court is not confined to the pleadings but may consider other evidence in the record.  *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004).  As will be discussed below, the court concludes that the Adversary invokes its post-confirmation jurisdiction to implement and execute *[Debtors']  Third Amended Joint Plan of Reorganization* (Case docket no. 537, the "Plan").  As such, jurisdiction is proper, and the Adversary may proceed.

---

1    "Docket no." will hereinafter refer to the corresponding docket entry in either the above-captioned bankruptcy case (the "Case") or the above-captioned adversary proceeding (the "Adversary"), as so identified.

2    Although Talsma; Frisia Farms, Inc.; Frisia Hartley, LLC; and Frisia West, LLC are all plaintiffs in the Adversary, only Talsma filed a brief supporting this court's jurisdiction in the Adversary.  *See Talsma Brief*, Case docket no. 748, at 1.  For clarity, references to arguments made by Talsma will represent the position taken by all Debtors in support of this court's jurisdiction.

This proceeding is subject to the court's subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(2)(A) and (O).[3]  This memorandum opinion constitutes the court's findings of fact and conclusions of law.  FED. R. BANKR. P. 7052.

# I. BACKGROUND

## A. The Bankruptcy Case

Debtors are four related entities engaged in dairy farming.  "Frisia Farms owns the cows that are milked.  Frisia Hartley raises the heifers in Hartley County, Texas.  Talsma cares for and milks the grown cows in Hico, Texas."  *In re Talsma*, 436 B.R. 908, 910 (Bankr. N.D. Tex. 2010).  On June 1, 2010, Talsma, Frisia Hartley, and Frisia Farms filed voluntary petitions under chapter 11 of the Bankruptcy Code.[4]  On February 16, 2011, a related entity, Frisia West LLC, filed a voluntary petition under chapter 11 of the Code.  All four cases are jointly administered.

On June 8, 2011, the court confirmed the Plan, as modified by the First, Second, and Third Modifications.  *Order Confirming [the Plan], As Modified, Filed by [Debtors]*, Case docket no. 576.  About one month after the court confirmed the Plan, Debtors and Wells Fargo entered into a post-confirmation term note (Exhibit[5] 25, the "Note") in the amount of $13,562,397.67 and a related security agreement (Exhibit 5, the "Security Agreement").  The Note and the Security Agreement were executed pursuant to the term sheet included as Exhibit 1 to the Plan (the "Plan Term Sheet").

The Note, the Security Agreement, and the Plan Term Sheet (collectively, the "Plan Documents"), as well as the Plan itself, each include provisions that cross-reference the other

---

3    *See also infra* Section II.A.

4    11 U.S.C. §§ 101 *et seq.* (2006) (the "Code").

5    *See infra* note 9.

documents, particularly within the respective default provisions.  For instance, paragraph 4.2 of

the Plan states:

> The allowed claim of the Class II creditor (Wells Fargo Bank), shall be paid and
> secured by the collateral as set forth in the Plan Term Sheet which is attached
> hereto and identified as the Exhibit "1".  Such treatment includes the covenants
> which are attached to the Plan Term Sheet as the Exhibit A – Wells Fargo
> Covenants.

*Plan*, Case docket no. 537, ¶ 4.2.  Paragraph 6 of the Plan Term Sheet reflects this language in

more specific terms, saying

> Following the Effective Date, if requested by Wells Fargo, the Debtors shall
> promptly execute and deliver to Wells Fargo, in form satisfactory to Wells Fargo,
> a security agreement that contains covenants substantially as set forth on [the Plan
> Term Sheet], in addition to other terms and provisions ordinarily contained in
> Wells Fargo's security agreements or which were contained in Debtors' pre-
> petition security agreements with Wells Fargo not inconsistent with [the Plan
> Term Sheet].  The Debtors shall keep and observe covenants contained in [the
> Plan Term Sheet]; provided, that in the event of a conflict between [the Plan Term
> Sheet] and the new security agreement, the latter shall control.

*Plan Term Sheet*, Case docket no. 537–1, ¶ 6.  Paragraph 10 of the Plan Term Sheet includes

Debtors' promise to amend the Plan consistent with the Plan Term Sheet, in exchange for which

Wells Fargo would support the Plan.  *Id.* ¶ 10.  Moreover, the "Defaults and Remedies" section

of Plan Term Sheet expressly connects a default under the Plan and the eventual terms of the

Security Agreement.  *Id.* at 6–7.

Under the Note, "Events of Default" include:

> [If Debtors] fail[] to make any of the payments to [Wells Fargo] that are specified
> or required herein within 15 days of the due date thereof, or if there shall occur
> any defined event of default *under the Security Agreement, the Plan of
> Reorganization, or any other Related Document . . . .*

Exhibit 25 ¶ 6 (emphasis added).  Likewise, the "Events of Default" under the Security

Agreement are even more expansive and inclusive of obligations under the Plan, stating:

The occurrence of any of the following shall constitute an "Event of Default" under this Agreement: (a) Borrower fails to make any of the payments to Bank that are specified or required *under the Plan of Reorganization* or herein within 15 days of the due date thereof; (b) Borrower fails to make any of the payments to creditors other than Bank that are specified or required *under the Plan of Reorganization* within 30 days of the due date thereof (or within the cure period applicable to such creditor, if late); . . . (f) Borrower shall fail to observe or perform any other obligation, covenant or agreement contained herein, *the Plan of Reorganization or other agreement with Bank* and fails to cure such default within 30 days that Bank sends notice of same to Borrower . . . .

Exhibit 5 ¶ 9 (emphasis added).

### B. The Dispute

After confirmation of the Plan and execution of the Note and the Security Agreement, a series of disputes arose between the parties about Debtors' payment obligations on Wells Fargo's claim under the Plan. The deterioration of relations stemmed from an increasing loan-to-value ("LTV") ratio of the Note to the value of Debtors' collateral and disagreements over several other restrictive covenants. Exhibit 6 ¶¶ E-K. These events led to the execution of a Forbearance Agreement (Exhibit 6, the "Forbearance Agreement"), by which Wells Fargo withheld foreclosure as consideration for certain alterations to Debtors' obligations under the Note, and a Deposit Account Control Agreement (Exhibit 29, the "Control Agreement"), by which Wells Fargo perfected a security interest in Talsma's deposit account at TexasBank. Exhibit 6 ¶¶ 1–7; Exhibit 29 ¶ 2.

Talsma avers that "[t]hrough a variety of harassing behavior including but not limited to fabricated defaults and pressure tactics . . . [Wells Fargo] coerced [Talsma] into entering a [Control Agreement] and a Forbearance Agreement." *Talsma Brief*, Case docket no. 748, ¶ 6. Further, Talsma contends that Wells Fargo "has falsely alleged and continues to falsely allege that [Talsma is] in default on certain loan covenants . . . [and that Wells Fargo] has alleged the manufactured defaults for the purpose of forcing [Talsma] into paying a higher interest rate than

called for under the Plan." *Id.* ¶ 7.  Likewise, Talsma argues these alleged manufactured defaults were intended to "add[] to [Wells Fargo's] claim attorney's fees and other charges allegedly incurred by [Wells Fargo] that are neither reasonable nor necessary."  *Id.*

In response, Wells Fargo argues that "Talsma obscures, avoids, or altogether omits decisive facts establishing that Wells Fargo's actions were well within its existing authority under the original Security Agreement and/or were appropriate remedies under the circumstances."  *Wells Fargo Brief*, Case docket no. 751, ¶ 5.  Specifically, Wells Fargo counters Talsma's assertions by noting problems with Debtors' LTV ratios and Talsma's compensation disbursements; contesting Talsma's characterization of accelerated payments in late 2012 and early 2013; disputing Talsma's contentions that "Wells Fargo has been trying to 'get rid' of [Talsma] and his Affiliated Borrowers and to 'force [them] out of business[;]'" and restating requirements under the Security Agreement about establishing control accounts, limiting capital expenditures, and paying proceeds from the sale of the New Isis Theater.[6]  *Id.*

### C. Reopening the Case and Filing the Adversary

On November 15, 2013, Debtors filed a *Motion to Temporarily Reopen [the Case]* (Case docket no. 736, the "Motion to Reopen").  By the Motion to Reopen, Debtors sought to have the Case reopened so as to file the Adversary against Wells Fargo for various alleged causes of action, including breach of contract, breach of fiduciary duty, and fraud.  *Talsma Brief*, Case

---

6    In addition to the various dairy-related assets, Debtors scheduled an interest in the New Isis Theater located at 2401 N. Main Street, Fort Worth, Texas 76164 (the "Theater").  *Schedule A – Real Property*, Case docket no. 79, at 2.  The Security Agreement required Debtors (1) to commence marketing the Theater for a cash sale; (2) to close a transaction selling the Theater by June 30, 2013; (3) if unable to sell the Theater, "to engage an auctioneer and to have tendered the Theater for sale by public action to be conducted not later than August 31, 2013;" and (4) to remit fifty percent of the proceeds of the sale to Wells Fargo.  Exhibit 5 ¶ 6(d)(8).  In lieu of selling the  Theater, the Security Agreement provided that Debtors could pay Wells Fargo $250,000 by June 30, 2013.  *Id.*  The Forbearance Agreement modified these obligations to require Talsma to pay the expected $250,000 in proceeds from selling the Theater to Wells Fargo.  Exhibit 6 ¶ I.  Talsma and Wells Fargo continue to dispute the distribution of the proceeds from the sale of the Theater.  *See Supplemental Br. in Supp. of Ct.'s Jurisdiction over Controversy*, Adv. docket no. 25, at 2–3; *Wells Fargo Brief*, Case docket no. 751, ¶ 5(f)(iv).

docket no. 748–1, at 16–23. Wells Fargo objected to reopening the case and to jurisdiction. *Wells Fargo's Objection to [the Motion to Reopen]*, Case docket no. 738 (the "Objection").

On December 16, 2013, the court heard arguments on the Motion to Reopen and the Objection (the "Hearing to Reopen"). The court limited argument at the Hearing to Reopen solely to whether the Case should be reopened pursuant to 11 U.S.C. § 350. Over the Objection, the court reopened the Case and then directed the parties to obtain a hearing date and to set a briefing schedule regarding the court's jurisdiction in the Adversary. *Tr. Hr'g to Reopen*, Case docket no. 745, at 3–6. On December 23, 2013, the court entered a corresponding order. *Order Reopening [the Case]*, Case docket no. 743, at 2.[7]

On January 29, 2014, the court held a hearing on the Parties' Briefs concerning jurisdiction in the Adversary (the "Hearing on Jurisdiction").[8] At the Hearing on Jurisdiction, the court heard argument from counsel and testimony from two witnesses—Kristine Netjes, Senior Vice President of Wells Fargo in the Credit Resolution Group, and Talsma—and received into evidence exhibits identified as necessary below.[9] Following the Hearing on Jurisdiction, the court took the issue of jurisdiction under advisement and referred the parties to mediation.

On February 7, 2014, the parties entered a *Stipulation Regarding Mediation* (Adv. docket no. 12, the "Stipulation"), by which the parties agreed to (1) attend a one-day mediation session; (2) toll any deadlines related to the *Scheduling Order* (Adv. docket no. 2, the "Scheduling Order") pending the outcome of the mediation session and, if necessary, the court's ruling on

---

7   The court amended its *Order Reopening [the Case]* on January 15, 2014, to conform the briefing deadlines to the timetable outlined in the court's bench ruling at the Hearing to Reopen. *Compare Am. Order Reopening [the Case]*, Case docket no. 749, at 2, *with Tr. Hr'g to Reopen*, Case docket no. 745, at 6.

8   For a full transcript of the Hearing on Jurisdiction, see Adversary docket no. 22.

9   For a list of exhibits admitted into evidence at the Hearing on Jurisdiction, see Adversary docket no. 10. Debtors' exhibits will be cited by the corresponding letter, and Wells Fargo's exhibits will be cited by the corresponding number. All exhibits cited in this memorandum opinion will be from the Hearing on Jurisdiction.

jurisdiction; and (3) temporarily stay a related arbitration proceeding filed by Wells Fargo. *Stipulation*, Adv. docket no. 12, at 1–2.  Subsequently, on February 24, 2014, the mediator noticed a *Statement Regarding Conclusion of Mediation* (Adv. docket no. 13), declaring the parties to be at an impasse.

As a result, the court now issues this memorandum opinion.  Having considered the arguments at the Hearing on Jurisdiction, the Parties' Briefs, the record, and the applicable case law, the court concludes that the Adversary is within the limits of the court's post-confirmation jurisdiction to implement and execute the Plan.

## II. DISCUSSION

The Adversary confronts the bounds of bankruptcy court jurisdiction and authority.  First, the causes of action Debtors assert against Wells Fargo raise questions about this court's subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157.  Second, questions of constitutional authority require attention in light of the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), and the Fifth Circuit's decisions in *Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313 (5th Cir. 2013), and *BP RE, L.P. v. RML Waxahachie Dodge, L.L.C. (In re BP RE, L.P.)*, 735 F.3d 279 (5th Cir. 2013).  And, finally, even assuming the court has jurisdiction under sections 1334 and 157 and authority under *Stern*, *Frazin*, and *BP RE*, "bankruptcy court jurisdiction does not last forever . . . ."  *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 389 (5th Cir. 2001).  So the court must address how the confirmation of the Plan affects, if at all, jurisdiction over the claims asserted in the Adversary.  The court will address the issues of subject-matter jurisdiction, constitutional authority, and post-confirmation jurisdiction in turn.

*A. Subject-Matter Jurisdiction Under 28 U.S.C. §§ 1334 and 157*

*1. Statutory Framework for Subject-Matter Jurisdiction*

Turning first to subject-matter jurisdiction, the analysis begins with section 1334 of the Judicial Code, which "is the sole statutory source of bankruptcy court jurisdiction." *Faulkner v. Eagle View Capital Mgt. (In re The Heritage Org., L.L.C.)*, 454 B.R. 353, 359 (Bankr. N.D. Tex. 2011) (Houser, C.J.) (citing *Hill v. Day (In re Today's Destiny, Inc.)*, No. 06–3285, 2007 WL 2028111 (Bankr. S.D. Tex. July 6, 2007)). Congress granted district courts "original and exclusive jurisdiction of all cases under title 11" and original, but not exclusive, jurisdiction "of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a)–(b) (2006). The district court may refer "any or all" bankruptcy cases and proceedings to their respective district's bankruptcy judges. *Id.* § 157(a).

The classification of an adversary proceeding under section 1334 depends on the connection of the proceeding to the bankruptcy case. "Arising under" jurisdiction involves causes of action created or determined by a statutory provision of title 11. *Fire Eagle L.L.C. v. Bischoff (In re Spillman Dev. Grp.)*, 710 F.3d 299, 304–05 (5th Cir. 2013); *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987). "Arising in" jurisdiction is "not based on a right expressly created by title 11, but is based on claims that have no existence outside of bankruptcy." *Faulkner*, 454 B.R. at 360 (citing *Wood*, 825 F.2d at 97). "Arising under" and "arising in" proceedings are "core" proceedings. 28 U.S.C. § 157(b)(1); *Stern*, 131 S. Ct. at 2605; *U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002).

In comparison, "related to" jurisdiction exists if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *Celotex Corp. v.*

*Edwards*, 514 U.S. 300, 307 n.6 (1995) (emphasis added) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984)); *U.S. Brass*, 301 F.3d at 304. That state law may affect a proceeding's resolution cannot be the sole basis by which a proceeding is excluded from the otherwise large net cast by "related to" jurisdiction. 28 U.S.C. § 157(b)(3). Proceedings that involve merely "related to" jurisdiction and do not otherwise arise under the Code or arise in a bankruptcy case are "non-core." *Faulkner*, 454 B.R. at 360.

A bankruptcy judge's authority in these cases and proceedings differs depending on whether the subject matter is "core" or "non-core." 28 U.S.C. § 157(b)–(c). A bankruptcy court may hear and determine (*i.e.*, enter a final order) all cases filed under title 11 and all proceedings within a bankruptcy court's "core" authority, subject to a more deferential standard of review by the district court. *Id.* § 157(b)(1); Fed. R. Bankr. P. 8013 (clear error standard for factual findings). Section 157(b)(2) provides a non-exclusive list of such core proceedings. *Id.* § 157(b)(2). In non-core proceedings, the statute limits the bankruptcy court to issuing proposed findings of fact and conclusions of law to the district court, "and any final order shall be entered by the district judge . . . after reviewing *de novo*" the objections of either party. *Id.* § 157(c)(1).

### 2. Core and Non-Core Claims in the Adversary

With this framework in mind, the court now turns to the causes of action in the Complaint. By the Complaint, Debtors plead seven causes of action, including: (1) Breach of Contract; (2) Unjust Enrichment; (3A) Tortious Interference with Existing Contract—Two Sisters Dairy, LLC Contract; (3B) Tortious Interference with Existing Contracts—Contracts/Notes with Lone Star FLCA and Lone Star PCA; (4) Negligence, Gross Negligence, Negligent Misrepresentation, and Fraud; (5) Breach of Fiduciary Duties; (6) Declaratory

Judgment; and (7) Application and Request for Injunctive Relief.  *Complaint*, Adv. docket no. 1, at 16–23.

All of these causes of action could have conceivable effects on distributions to Debtors' creditors, thus invoking, at a minimum, "related to" jurisdiction.[10]  *See Fire Eagle*, 710 F.3d at 304–05.  Counts 1 and 6, although pled as the common law causes of action of breach of contract and declaratory judgment, both implicate the bankruptcy court's statutory powers under 11 U.S.C. § 1142(b) and 28 U.S.C. § 157(b)(2)(O), as well as the court's inherent power to interpret and implement its own orders.  Fed. R. Bankr. P. 3020(d) ("Notwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate."); *Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 138 (2009) ("The Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders . . . ."); *U.S. Brass*, 301 F.3d at 306 ("Proceedings invoking the bankruptcy court's statutory authority to enter orders necessary for the consummation of a confirmed plan [are 'arising in' proceedings] because the authority can be exercised only in the context of a bankruptcy case."); *cf. Law v. Siegel*, 134 S. Ct. 1188, 1198 (2014) (discussing bankruptcy court's inherent powers under 11 U.S.C. § 105(a)) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991)); *see also Nat'l Benevolent Ass'n of the Christian Church (Disciples of Christ) v. Weil, Gotshal & Manges, LLP (In re Nat'l Benevolent Ass'n of the Christian Church (Disciples of Christ))*, 333 F. App'x 822, 826 (5th Cir. 2009) ("A final decree closing the case after the estate is fully administered does not deprive the court of

---

10    Talsma represented in his brief that Debtors "have made significant payments to the secured creditors [Wells Fargo] and Lone Star Bank and have paid AgStar bank in full [and that Talsma] and Debtors have paid all other creditors as required, pursuant to the Plan."  *Talsma Brief*, Case docket no. 748, at 3.  Considering the terms of the Plan, Talsma's representation means that Classes 1, 3, 21, and 23 under the Plan have been Paid in full, while Classes 2, 4–20, 22, and 24–26 under the Plan appear to still be owed payment pursuant to the Plan's terms.  *Plan*, Case docket no. 537, ¶¶ 4.1–4.27.  As a result, because distributions remain to be made under the Plan, Debtors' potential recovery by the Adversary would have a conceivable effect on distributions to Debtors' creditors.

jurisdiction to enforce or interpret its own orders.").[11]  As a result, Counts 1 and 6 are core claims as to which the bankruptcy court may issue a final order.  *See* 28 U.S.C. § 157(b).  Counts 2, 3, 4, 5, and 7 are, at a minimum, non-core, "related to" proceedings that the court may hear and for which the court may make proposed findings of fact and conclusions of law.  *See id.* § 157(c)(1).  Accordingly, subject-matter jurisdiction exists over the Adversary under 28 U.S.C. §§ 1334 and 157, unless circumscribed by the Plan's confirmation.

### B. Constitutional Authority

Based on the decisions in *Stern*, *BP RE*, and *Frazin*, the issue of this court's constitutional authority to determine the Adversary requires discussion.  The issue is not subject-matter jurisdiction or statutory authority—which will be discussed further below—but whether this court's powers under Article I of the U.S. Constitution authorize a final determination in matters requiring the "judicial Power of the United States."  *See* U.S. CONST. art. III, § 1. Without salary protection and life tenure, a bankruptcy judge's ability to exercise this power is limited to those matters that lie "at the core of federal bankruptcy power . . . ." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982).  Put another way, "Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy case itself or would necessarily be resolved in the claims allowance process."  *Stern*, 131 S. Ct. at 2618 (emphasis in original).

Applying this test from *Stern*, paired with the court's conclusion below that the alleged breach of the Plan Documents is tantamount to an alleged breach of the Plan itself, it is apparent

---

11    Moreover, the court maintains jurisdiction over the conversion or dismissal of the Case under 11 U.S.C. § 1112(b) and over the eventual discharge (or denial of discharge) under 11 U.S.C. § 1141(d)(3) and (5), to Talsma, who as an individual is not eligible for a discharge until all payments required by the Plan are made.  11 U.S.C. § 1141(d)(5)(A).

that the court has authority to determine at least some of the counts in the Complaint. The question is: In what counts may the court issue a final determination and in what counts will that authority be limited to making proposed findings of fact and conclusions of law? The Fifth Circuit's opinion in *Frazin* sheds some light on this question.

In *Frazin*, the Fifth Circuit held that a debtor's claim against his former attorneys under the Texas Deceptive Trade Practices Act ("DTPA") did not need to be determined in order to determine the attorneys' fee application. 732 F.3d at 323–34. Because deciding the DTPA claim in *Frazin* was unnecessary as part of the claims allowance process, the bankruptcy court was without constitutional authority to issue a final judgment, even with the parties' consent. *Id.* at 320 n.3, 323–34. But the Fifth Circuit affirmed the bankruptcy court's authority to determine the other claims that were closely related to the debtor's objections to the attorneys' fee applications because those claims were necessarily resolved in settling the attorneys' requests for administrative expenses. *Id.* at 324–25.

Here, although asserted by an adversary complaint, Counts 1 and 6 hinge on whether Wells Fargo breached the Plan and Plan Documents. This determination is styled in a different procedural posture than the counterclaim in *Stern*, which was asserted by the estate in response to a tortious interference claim. *See Stern*, 131 S. Ct. at 2617–18. Moreover, the Adversary differs substantively as well. The counterclaim at issue in *Stern* was core only by way of the inclusion of counterclaims filed by the estate in section 157(b)(2)(C) of title 28. *Id.* at 2612. Here, the construction of the Plan and Plan Documents stems directly from the bankruptcy plan itself. So the court concludes constitutional authority exists for a final determination, at a minimum, over Counts 1 and 6.

The court need not address specific authority over Counts 2, 3, 4, 5, and 7 except to say that, under *Frazin*, authority exists over these individual counts to the extent factual findings or legal conclusions specific to those counts are necessary to finally determine Counts 1 or 6. *See Frazin*, 732 F.3d at 323–24. But such determinations are best made on a complete record. Moreover, the Supreme Court may clarify the bounds of bankruptcy court authority with its decision in *Executive Benefits Insurance Agency v. Arkison*, No. 12–1200 (U.S. filed Sept. 13, 2013).[12] As a result, the court need only conclude that authority exists for Counts 1 and 6.

### C. Post-Confirmation Jurisdiction

Having concluded subject-matter jurisdiction is proper and constitutional authority is present, the court now turns to the effect of the Plan's confirmation on jurisdiction in the Adversary. In some circuits, analysis of jurisdiction and competence alone would be sufficient,[13] but the Fifth Circuit has taken a narrow view of post-confirmation jurisdiction. *See Craig's Stores*, 266 F.3d at 390. Bankruptcy courts have broad *in rem* powers to administer the estate assets and oversee the claims allowance process. *See Stern*, 131 S. Ct. at 2618; *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004). Yet, in a chapter 11 case, "[e]xcept as otherwise provided in the plan or the order confirming the plan,[14] the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1141(b). As a result, "[a]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy court

---

12   A decision in *Executive Benefits* is expected by June 2014, likely before the parties are to appear for trial docket call on June 26, 2014.

13   *See, e.g.*, *Bos. Reg'l Med. Ctr., Inc. v. Reynolds (In re Bos. Reg'l Med. Ctr., Inc.)*, 410 F.3d 100, 106 (1st Cir. 2005) (rejecting the idea of more limited bankruptcy court jurisdiction post-confirmation because "[o]n its face, section 1334 does not distinguish between pre-confirmation and post-confirmation jurisdiction").

14   Of course, a bankruptcy court may not "reserve jurisdiction beyond what Congress has given or beyond what is necessary to effectuate the plan of reorganization." *Zahn Assocs., Inc. v. Leeds Bldg. Prods., Inc. (In re Leeds Bldg. Prods., Inc.)*, 160 B.R. 689, 691 n.3 (Bankr. N.D. Ga. 1993) (citing *Grimes v. Graue (In re Haws)*, 158 B.R. 965, 969 (Bankr. S.D. Tex. 1993)).

jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Craig's Stores*, 266 F.3d at 390.

But the Fifth Circuit's seemingly broad and exacting statements about post-confirmation jurisdiction in *Craig's Stores* cannot be read in isolation.  Instead, the analysis is fact specific and requires some further synthesis of several Fifth Circuit cases in addition to *Craig's Stores*.

### 1. Citizens Bank & Trust Co. v. Case (In re Case)

In *Case*, the Fifth Circuit upheld a bankruptcy court decision to reopen a bankruptcy case and determine a challenge to an integral part of a confirmed plan.  937 F.2d 1014, 1018–19 (5th Cir. 1991).  The bankruptcy court confirmed an individual debtor's chapter 11 plan that provided for a settlement between the debtor and a bank and the execution of a corresponding promissory note in favor of the bank.  *Id.* at 1017.  Twenty months after confirmation, the bankruptcy court entered an order declaring the plan to have been "consummated" and closed the case.  *Id.*  A few months later, the debtor defaulted on the promissory note, and the bank brought suit in state court.  *Id.*  The debtor counterclaimed for a breach of contract, alleging that the bank fraudulently induced him into executing the promissory note through an oral promise that he could satisfy the note by rendering professional services to the bank.  *Id.*  The bank successfully petitioned the bankruptcy court to reopen the bankruptcy case, removed the state court lawsuit to bankruptcy court, and prevailed at trial.  *Id.*  The debtor appealed, challenging the bankruptcy court's jurisdiction on grounds that the dispute depended on state law and that the bankruptcy court lacked authority to adjudicate the proceeding as a "core proceeding" under 28 U.S.C. § 157.  *Id.* at 1018.

The Fifth Circuit affirmed, holding that the proceeding was core because it involved "the administration of the estate" under section 157(b)(2)(A).  *Id.* at 1019.  Moreover, the Fifth

Circuit held that the dispute at issue—the validity of the alleged oral agreement to satisfy the promissory note with professional services—would have "altered the express terms of the reorganization plan and would have constituted an 'adjustment of the debtor-creditor relationship' under § 157(b)(2)(O)." *Id.* at 1020. As a result, the Fifth Circuit connected the reopened case and the removed adversary, saying:

> The dispute at issue here *cannot be severed* from the remainder of the bankruptcy court proceedings. The promissory note though satisfying a pre-bankruptcy debt, was confected in the general negotiations seeking to settle all claims against the estate and was necessary to the formulation of a reorganization plan which was acceptable to all creditors. The note *was provided for in, and executed as an integral part of, the settlement agreement and reorganization plan* which was confirmed by the bankruptcy court

*Id.* (emphasis added).

For the same reason, as will be discussed further below, applying the decision in *Case* to the Adversary the court should exercise post-confirmation jurisdiction. The Plan Documents were integral parts of the Plan such that the dispute may not be severed from the Plan itself.

### 2. *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.)*

In *Craig's Stores*, the Fifth Circuit held a bankruptcy court exceeded its post-confirmation jurisdiction by determining a dispute that was independent of, and antecedent to, the bankruptcy case. 266 F.3d at 390–91. There, the debtor had a long-term, pre-bankruptcy relationship with Bank of Louisiana to administer its in-house credit card program and to finance its operations by factoring its receivables. *Id.* at 389. By its plan in bankruptcy, the debtor assumed the contract with Bank of Louisiana. *Id.* Eighteen months after confirmation, the debtor sued Bank of Louisiana, asserting non-core, state law claims alleged to have arisen before and after confirmation. *Id.* Neither of the parties objected to jurisdiction, and the bankruptcy court entered a judgment for the debtor. *Id.* On appeal, the district court *sua sponte* raised

questions about jurisdiction, requested further briefing from the parties, and ultimately vacated the bankruptcy court order and dismissed the adversary for lack of jurisdiction. *Id.* at 390.

The Fifth Circuit affirmed the disposition, adopting the three arguments made by the debtor in support of jurisdiction as factors to be considered.[15] *Id.* at 391. These three factors are whether (1) the dispute dealt principally with the pre- or post-confirmation relations of the parties; (2) the parties were antagonistic toward each other at the time of confirmation; and (3) any facts or law deriving from the bankruptcy or the plan were necessary to determine the claim asserted. *Id.* The Fifth Circuit held that none of the factors favored the debtor in *Craig's Stores* because the dispute centered on post-confirmation relations, no antagonism existed between the parties at confirmation, and neither the facts nor the law from the bankruptcy or the plan were necessary to resolve the dispute. *Id.* As a result, "the state law causes of action asserted by Craig's against the Bank [did] not bear on the *implementation or execution* of the debtor's plan and therefore [did] not fall within the bankruptcy court's post-confirmation jurisdiction." *Id.* (citing 11 U.S.C. § 1142(b)) (emphasis added).

The Fifth Circuit distinguished *Case* because *Case* involved "a post-confirmation dispute over a promissory note provided for in the debtor's reorganization . . . ." *Id.* Importantly, the panel emphasized the third factor in its analysis, saying "[u]nlike the dispute in *Case*, the post-confirmation dispute at issue in this appeal has nothing to do with any obligation created by the debtor's reorganization plan." *Id.* (citing *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1064 (5th Cir. 1997)).

---

15    Or, more accurately, the panel addressed the debtor's three arguments so specifically that subsequent courts have adopted these points as a three-factor test. *E.g.*, *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008).

The third factor is likewise dispositive here to align the Adversary factually with *Case* rather than *Craig's Stores*. Thus, to the extent *Craig's Stores* applies, post-confirmation jurisdiction would also be proper under the factor analysis.

### 3. U.S. Brass Corp. v. Travelers Insurance Group (In re U.S. Brass Corp.)

In *U.S. Brass*, the Fifth Circuit affirmed a bankruptcy court's exercise of jurisdiction post-confirmation pursuant to a clause in a confirmed plan. 301 F.3d 296, 299 (5th Cir. 2002). The plan provided "that certain claims against the Chapter 11 debtor and its non-debtor affiliates would be resolved in a court of competent jurisdiction and determined by settlement or final judgment." *Id.* The claims involved post-confirmation relations between the parties, and the "plan ha[d] been substantially consummated, but it ha[d] not been *fully* consummated." *Id.* at 305 (emphasis in original). Nonetheless, the court upheld jurisdiction even under *Craig's Stores* by emphasizing the third factor, saying:

> Bankruptcy law will ultimately determine this dispute, and the outcome could affect the parties' post-confirmation rights and responsibilities. Furthermore, this proceeding will certainly impact compliance with or completion of the reorganization plan. Consequently, the Appellant's motion pertains to the plan's implementation or execution and therefore satisfies the *Craig's Stores* test for post-confirmation jurisdiction.

*Id.* Moreover, the *U.S. Brass* court analyzed section 1142(b)[16] to conclude that "proceedings within the contemplation of § 1142(b) are more appropriately viewed as 'arising in' a case under title 11." *Id.* at 306. Because an order compelling action to consummate a plan could not exist

---

16      Section 1142(b) states:

> (b) The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

11 U.S.C. § 1142(b).

outside of a bankruptcy case, such a proceeding invoked a bankruptcy court's "arising in" authority and could be finally determined by that court. *Id.*; *see* 28 U.S.C. § 157(b)(1).

The connection drawn in *U.S. Brass* between core proceedings and the third factor in *Craig's Stores* has led other courts to question the scope of *Craig's Stores*. *E.g.*, *Faulkner v. Eagle View Capital Mgt. (In re Heritage Org., L.L.C.)*, 454 B.R. 353, 364–65 (Bankr. N.D. Tex. 2011) (concluding that *Craig's Stores* did not apply to an "arising under" proceeding brought pursuant to 11 U.S.C. § 550 post-confirmation); *Cano v. GMAC Mortg. Corp. (In re Cano)*, 410 B.R. 506, 458–59 (Bankr. S.D. Tex. 2009) (transferring a proceeding to bankruptcy court that required determination of whether certain debts were extinguished by a plan confirmed three years earlier because "[s]uch a declaration inherently requires interpretation of the confirmed plan, and thus falls under the "arising under" prong of bankruptcy"). *Craig's Stores* involved claims that invoked only "related to" jurisdiction. But core claims will typically have the connection to bankruptcy that was lacking in *Craig's Stores* because core claims are, by definition, limited to claims "arising under" title 11 or "arising in" a case under title 11. *See* 28 U.S.C. § 157(b)(1); *Stern*, 131 S. Ct. at 2605. Thus, courts have treated core proceedings differently post-confirmation than the "related to" proceedings within the scope of *Craig's Stores*. *Mackey v. M.C. Invs. (In re Martinez)*, No. 00–40412, 2000 WL 34508398, at *1–2 (5th Cir. Oct. 5, 2000) (unpublished) (holding that the bankruptcy court properly exercised jurisdiction three years after a confirmed plan over an "arising under" proceeding that stemmed from a note and deed of trust executed pursuant to the plan); *Bradley v. Barnes (In re Bradley)*, 989 F.2d 802, 803–05 (5th Cir. 1993) (holding that the bankruptcy court's final determination in a core, "arising under" proceeding pursuant to 11 U.S.C. § 525 was proper two years after discharge in a chapter 7 case); *Faulkner*, 454 B.R. at 364–65; *Cano*, 410 B.R. at 458–59. Such a

reading is consistent with the legislative history of the Code, which cautioned against conscribing bankruptcy court jurisdiction too narrowly post-confirmation, stating:

> The use of the term 'proceeding,' though, is not intended to confine the bankruptcy case. Very often, issues will arise after the case is closed, such as over the validity of a purported reaffirmation agreement, proposed 11 U.S.C. 524(b), the existence of prohibited post-bankruptcy discrimination, proposed 11 U.S.C. 525, the validity of securities issued under a reorganization plan, and so on. The bankruptcy courts will be able to hear these proceedings *because they arise under title 11*.

H.R. Rep. No. 95–595, at 445 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6401 (emphasis added). So it follows from *U.S. Brass* that the test from *Craig's Stores* does not apply to a claim under 11 U.S.C. § 1142(b), which is a core, "arising in" proceeding.

The result of applying the analysis from *U.S. Brass* in the Adversary would be the same because Counts 1 and 6 of the Complaint implicate core claims. As a result, under *U.S. Brass* post-confirmation jurisdiction in the Adversary would be properly exercised.

### 4. Newby v. Enron Corp. (In re Enron Corp. Securities)

In *Newby*, the Fifth Circuit clarified the effects of a confirmed plan on jurisdiction over lawsuits pending at the time of confirmation. 535 F.3d 325, 325 (5th Cir. 2008). There, several securities lawsuits against the debtor and other related parties were pending when the district court confirmed the debtor's plan. *Id.* at 331–33. Following confirmation, the district court, relying on its bankruptcy jurisdiction, entered a final order dismissing several of the pending cases with prejudice. *Id.* at 334. The plaintiffs appealed, arguing that the district court lacked jurisdiction post-confirmation to enter such a final order. *Id.*

The Fifth Circuit affirmed after analyzing *Craig's Stores* and *U.S. Brass*, concluding that (1) *Craig's Stores* did not divest the district court of subject-matter jurisdiction that was otherwise proper at the time of confirmation; and (2) even if *Craig's Stores* did apply, the first

two factors of timing and antagonism were sufficiently present to outweigh the third factor.  *Id.* at 335–36.  Thus, because *Newby* involved pre-confirmation antagonistic relations in proceedings independent of the bankruptcy, the decision is not particularly applicable here.  But *Newby* demonstrates yet another Fifth Circuit panel limiting *Craig's Stores* to its facts.

### 5. Exercising Post-Confirmation Jurisdiction Is Proper in the Adversary

The court concludes that the Plan's confirmation does not circumscribe the otherwise proper subject-matter jurisdiction and constitutional authority over Counts 1 and 6 of the Complaint.  Because Counts 1 and 6 involve core claims, the decisions in *Case* and *U.S. Brass* control this analysis rather than the treatment of non-core "related to" claims under *Craig's Stores*.  To the extent that *Craig's Stores* applies, the court finds post-confirmation subject-matter jurisdiction is still proper.  Because the disposition of Counts 1 and 6 will rely heavily on interpreting events of default under the Plan and Plan Documents, the third *Craig's Stores* factor—as in *U.S. Brass*—outweighs the first and second factors to favor jurisdiction.  *See U.S. Brass*, 301 F.3d at 305.

The inclusion of Plan Documents into the post-confirmation analysis appears to most trouble Wells Fargo.  *See Wells Fargo Brief*, Adv. docket no. 751, at 14 ("Most significantly, Talsma *fails to cite a single case* holding that a bankruptcy court generally retains jurisdiction over subsequent disputes arising from post-confirmation loan agreements and other contracts.") (emphasis in original).  But implementing and executing the Plan necessarily extends to the Plan Documents because those documents were integral to the confirmation and eventual consummation of the Plan, tied to the Plan by cross-referenced provisions, and executed closely

in time. *See In re Case*, 937 F.2d at 1020. The Plan Documents were inextricably intertwined with the Plan itself—to the point where a breach of one was a breach of the other.[17]

For these reasons, the Plan is not merely "an empty shell that said, 'See the term sheet.'" *Tr. Hr'g on Jurisdiction*, Adv. docket no. 22, at 5:13–14. Instead, the provisions of the Plan Documents are rooted deeply in the Plan. Like the promissory note in *Case*, the Security Agreement and Note here were closely tied to the plan negotiation process and were an integral part of obtaining Wells Fargo's support of the Plan. *Compare In re Case*, 937 F.2d at 1020, *with Plan Term Sheet*, Case docket no. 537–1, ¶ 16 ("Upon execution of this term sheet by all parties, the Debtors shall proceed to amend their Plan and disclosure statement to reflect the forgoing terms and to file the same with the Court. *Wells Fargo shall thereafter support confirmation of such amended plan.*") (emphasis added).

In its brief and at oral argument, Wells Fargo cited the *Zahn* case from the Northern District of Georgia as an analogous case involving a post-confirmation dispute over a promissory note. *Wells Fargo Brief*, Case docket no. 751, at 13–14 (citing *Zahn*, 160 B.R. at 691); *Tr. Hr'g on Jurisdiction*, Adv. docket no. 22, at 6:17–25. There, the confirmed plan created an indenture trust to pay the unsecured creditors that was funded by a promissory note from the debtor. *Zahn*, 160 B.R. at 690. Like the Plan here, the plan in *Zahn* appeared to have contemplated the terms of the promissory note,[18] and, although decided before *Craig's Stores*, *Zahn* applies the same test

---

17     *See supra* Section II.A for a restatement of the interlinked default provisions. Interestingly, Wells Fargo notes in its brief that "Talsma's defaults were tantamount to a breach of the Plan as well." *Wells Fargo Brief*, Case docket no. 751, ¶ 5(b). So Wells Fargo argues that Talsma's alleged defaults under the Security Agreement were "tantamount to a breach of the Plan" but continues to maintain that the alleged breaches of the Security Agreement by Wells Fargo were independent of the Plan. *Id.* ¶ 7; *Tr. Hr'g on Jurisdiction*, Adv. docket no. 22, at 13:13–14:9.

18     While not explicit, a reasonable reading of the *Zahn* opinion would suggest that the plan provided for the terms of the promissory note. The *Zahn* court stated: "Section 4.5 of the Plan required the Debtor to make certain payments to the unsecured creditors." *Zahn*, 160 B.R. at 691. But earlier in the opinion the *Zahn* court stated: "The Plan required the Debtor to enter into a trust indenture . . . [which] was to be funded by a promissory note . . . in the principal amount of $1,200,000, payable in 96 monthly installments." *Id.* at 690. For the purpose of this analysis,

to conclude that jurisdiction was improper. *Id.* at 691 ("Nevertheless, [a bankruptcy court's post-confirmation] role is limited to matters involving the execution, implementation, or interpretation of the plan's provisions, and to disputes requiring the application of bankruptcy law.") (citing *Goodman v. Phillip R. Curtis Enter. (In re Goodman)*, 809 F.2d 228, 233 (4th Cir. 1987)).  The *Zahn* court reasoned that the plan required a note, a conforming note was issued post-confirmation, and, by issuing the note, "the Debtor ha[d] implemented this provision of the Plan, and there [was] no question as to its interpretation." *Id.*

The court respectfully disagrees with this conclusion.  Although possible to distinguish *Zahn* factually as having a promissory note with terms free from interpretation questions, that line is one drawn too finely.  Instead, the court would follow the logical conclusion that determining whether a provision of a Plan or Plan Document has been breached necessarily requires interpreting that provision.  To the extent the *Zahn* court disagreed, the court finds its decision unpersuasive.

### III. CONCLUSION

For the foregoing reasons, the court concludes that it has post-confirmation subject-matter jurisdiction under 28 U.S.C. §§ 1334(b) and 157(b) over Debtors' claims in Counts 1 and 6 of the Complaint.  The court will reserve determining its authority over Counts 2, 3, 4, 5, and 7 because the factual findings of these counts may be necessary to determine Counts 1 and 6.

This memorandum opinion shall be incorporated in any final judgment or report and recommendation to the District Court.  Pursuant to the Stipulation, Wells Fargo will have until fourteen days after the court enters this memorandum opinion to answer the Complaint and to

---

the court will assume the plan in *Zahn* aligns with the Plan here in that both included, at a minimum, the critical terms of the promissory notes to be issued along with the respective plans.

respond to *[Debtors']* *Expedited Motion to Stay Arbitration Proceeding and Brief in Support* (Adv. docket no. 19). *Stipulation*, Adv. docket no. 12, ¶¶ 3–4. Likewise, the entry of this memorandum opinion will cease tolling of the deadlines under the Scheduling Order. *Id.* ¶ 3. Pursuant to the Scheduling Order, the parties are directed to appear for trial docket call on June 26, 2014, at 9:00 AM.

It is so **ORDERED**.


### ### END OF MEMORANDUM OPINION ###